NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2013-874


JAMES CONANT & a.

v.

TIMOTHY O'MEARA & a.

Argued: November 13, 2014
Opinion Issued: May 15, 2015


Orr & Reno, P.A., of Concord (Jeffrey C. Spear on the brief and orally), for the petitioners.


Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief and orally), for respondent Timothy O'Meara.


HICKS, J. Respondent Timothy O'Meara (O'Meara) appeals the order of the Superior Court (Wageling, J.) granting summary judgment against him and his law firm, O'Meara Newborn, PLLC, in this action brought by the petitioners, James and Anita Conant, for the equitable recovery of fees paid to O'Meara. Respondent O'Meara Newborn, PLLC did not appeal. We affirm in part and reverse in part.

Many of the facts underlying this action are recited in our previous decision disbarring O'Meara for ethical violations committed in the course of

representing the Conants. See O'Meara's Case, 164 N.H. 170 (2012). Accordingly, we provide only an abbreviated background below. Facts recited below that are not drawn from O'Meara's Case were either recited in the trial court's order or are supported by the record.

On May 19, 2005, Anita Conant was severely injured in an automobile accident in Pennsylvania. Id. at 172. She was rear-ended by a paving truck while stopped at a red light and, as a result of the spinal cord injury she suffered, she was rendered a ventilator-dependent quadriplegic. Id.

James Conant, Anita Conant's husband, retained O'Meara to represent the Conants in a personal injury suit arising out of the accident. He executed a contingent fee agreement providing, in part, "that O'Meara would be paid 33.33% of the gross amount recovered." Id. at 173 (quotation omitted). Approximately ten days after being retained by the Conants, O'Meara learned that the paving company whose truck was involved in the accident was insured for a total of $11 million. Id.

O'Meara filed suit on November 3, 2005, and, on December 1, was informed by opposing counsel that the insurer did not contest liability. Id. Approximately eight days later, O'Meara informed opposing counsel that he believed the suit was "a policy limits case" and had been instructed "to proceed to trial" if the policy limits were not paid. Id. (quotation omitted). At the time, O'Meara knew he lacked authority to settle the case for the policy limits. Id. A certified life planner later estimated that Anita Conant, who was forty-seven years old at the time of the accident, would need more than $23 million to sustain her for the rest of her life. Id. at 172, 174.

After expressing concern over O'Meara's unauthorized demand to settle, James Conant suggested that O'Meara reduce his fee. Id. at 174. O'Meara agreed to consider it, and thereafter proposed a $166,000 reduction. Id. Tension over O'Meara's fee persisted. Id. At a meeting on February 25, the parties discussed what O'Meara's fee should be if the case settled for the policy limits. Id. O'Meara offered to reduce his potential fee from $3.67 million to $3.17 million, which angered James Conant. Id. James Conant's brother stated "he had been informed that a $2 million fee was reasonable in a case such as this one," but "[n]one of the other Conants responded." Id. Instead, "[t]he exchange . . . became heated," id., and O'Meara was asked what would happen if the Conant family fired him. Id. at 175. "O'Meara responded that litigation 'gets ugly'" and "told the Conants that if they terminated his services, he would sue them for his one-third contingency fee and 'would win.'" Id. Eventually the parties modified the original fee agreement, initialing handwritten changes indicating that O'Meara's fee was "to be negotiated." Id. (quotation omitted).

2

The dispute over fees continued, and ultimately, on the day of a scheduled mediation in federal court in Pennsylvania, O'Meara informed the Conants at the courthouse "that he would not proceed with the mediation unless he received at least a $2 million fee." Id. James Conant felt he had no choice but to sign a memorandum agreeing to that fee. Id.

O'Meara negotiated an $11.5 million settlement subject to certain contingencies. After the mediation, the Conants dismissed O'Meara and the case settled for $11.5 million. Id. Subsequently, "the Conants and O'Meara agreed that the Conants would pay O'Meara an undisputed fee of $750,000, place $1,250,000 in escrow, and arbitrate the issue of how this amount should be divided." Id. At the arbitration, "O'Meara testified that, before he left the Conants' home on February 25, the Conants had agreed to pay him $2 million in fees." Id. at 176. In March 2009, the arbitration panel reached a decision awarding O'Meara $837,000 of the escrow fund and the Conants the remaining $413,000. See id. at 176. One arbitrator dissented.

On February 6, 2007, counsel for the Conants filed a grievance with the Attorney Discipline Office (ADO) alleging ethical violations by O'Meara. The ensuing disciplinary proceeding culminated in our September 18, 2012 order disbarring him. See id. at 182. In that order, we concluded that "O'Meara lied under oath when he testified at the arbitration that the Conants agreed to his $2 million fee at the February 25 meeting." Id. at 181. By petition dated October 17, 2012, the Conants commenced this case as an independent action in equity against O'Meara and his firm to disgorge all fees the Conants have paid them.

Ruling on cross-motions for summary judgment, the trial court set aside the arbitration judgment and ordered O'Meara "to return $837,000 to the Conants." The court also found that "at the time the Conants paid O'Meara an 'undisputed' fee amount, O'Meara had already violated his fiduciary duties, making his retention of the fee amount inequitable." Accordingly, it ordered O'Meara to disgorge the $750,000 the Conants paid him prior to arbitration. O'Meara appealed.[*]

On appeal, O'Meara argues that the trial court erred in: (1) permitting the petitioners to relitigate matters determined in the prior arbitration; (2) failing to find the petitioners' action barred by the statute of limitations; and (3) ordering fee forfeiture.

---

[*] The record is not clear how, or whether, provision for costs and expenses was made by the parties, the arbitrators, or the trial court. O'Meara mentions costs only briefly, contending that even when fees are disgorged, "costs advanced on behalf of the client do not get given back." He then observes that "[t]he arbitration dissent estimated this amount was 'approximately $37,000.'" Given the inadequacy of the record and briefing on this issue, and our ruling regarding the $750,000 paid prior to arbitration, we decline to consider the issue of costs.

We review the trial court's rulings on cross-motions for summary judgment under the following standard: "[W]e consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." Dube v. N.H. Dep't of Health & Human Servs., 166 N.H. 358, 364 (2014) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. (quotation omitted). "We review the trial court's application of the law to the facts de novo." Phaneuf Funeral Home v. Little Giant Pump Co., 163 N.H. 727, 730 (2012). To the extent that the trial court relied upon facts found by the ADO and upheld by this court in O'Meara's Case, those facts may not be challenged in this proceeding and, therefore, may be considered undisputed for summary judgment purposes. See e.g., Mut. Mortg. Servs., Inc. v. Stovall, No. 981686–CA, 1999 WL 33244791, at *1 (Utah Ct. App. March 25, 1999) (ruling "trial court correctly determined that no genuine dispute of material facts prevented summary judgment because collateral estoppel, also referred to as 'issue preclusion,' barred relitigation of facts established in . . . [previous] action"). Although we apply our traditional summary judgment standard of review to the legal issues and to the determination of whether a genuine issue of material fact exists, we review the trial court's decision to grant equitable relief — in the form of setting aside the arbitrators' award — for an unsustainable exercise of discretion. See Neumann v. Village of Winnipesaukee Timeshare Owners' Assoc., 147 N.H. 111, 115 (2001) (noting that "[w]e review the trial court's grant of equitable relief for an abuse of discretion"); State v. Lambert, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard); cf., e.g., Singer by Cohen v. Jones, 496 N.W.2d 156, 157 (Wis. Ct. App. 1992) (applying two-tiered standard of review to grant of constructive trust on summary judgment: de novo as to summary judgment and "abuse of discretion standard as to the trial court's ultimate decision to grant the equitable relief of a constructive trust").

O'Meara first contends that the Conants' claims are barred by res judicata and that the trial court erred in concluding otherwise. Specifically, O'Meara argues that the trial court erred in finding "that the issue of forfeiture was not presented in the arbitration." He asserts that the Conants' pleadings before the arbitrators raised the issue of forfeiture by asking for the return of all legal fees paid.

As the Conants point out, however, O'Meara fails to challenge on appeal the trial court's alternative ruling on the res judicata issue; namely, that "the arbitrators' decisions cannot stand because they were procured by fraud, so it is irrelevant that they had considered the appropriateness of part of O'Meara's fee." In other words, because the arbitrators' judgment was set aside by the trial court, that judgment cannot have preclusive effect. Cf. No East-West Highway Committee, Inc. v. Chandler, 767 F.2d 21, 24 (1st Cir. 1985) ("A

4

vacated judgment has no preclusive force either as a matter of collateral or direct estoppel or as a matter of law of the case."). We need not further address O'Meara's res judicata argument because he failed to challenge the alternative and sufficient basis for the trial court's ruling.

O'Meara next argues that the Conants' claims are barred by the statute of limitations. He asserts that there are several limitations deadlines that may be applicable to this case and that the Conants have missed all of them by several years. First, is the deadline set forth in the parties' agreement to submit to arbitration their claims to the disputed portion of the fee. In that agreement the Conants and O'Meara waived their rights under RSA 542:8 "except to the extent that either may seek an order from the New Hampshire Superior Court vacating the arbitrators' award solely for fraud, corruption, or misconduct by the parties or the arbitrators." They further agreed "that if neither party files a motion seeking such relief within 30 days of the date of the arbitrators' award, that award shall be final." O'Meara asserts "[t]hat period expired in 2007."

The second limitations period cited by O'Meara is set forth in New Hampshire's arbitration statute, which provides, in part:

> At any time within one year after the award is made any party to the arbitration may apply to the superior court for an order confirming the award, correcting or modifying the award for plain mistake, or vacating the award for fraud, corruption, or misconduct by the parties or by the arbitrators, or on the ground that the arbitrators have exceeded their powers.

RSA 542:8 (2007). O'Meara contends that this statutory period expired in 2008.

The third limitations period O'Meara cites is New Hampshire's general three-year statute of limitations for personal actions. RSA 508:4 (2010). O'Meara argues "that period expired in 2009 or 2010."

The first two limitations periods, by their terms, apply only to the Conants' claim to vacate the arbitrators' award. The trial court ruled that "despite the running of the statute of limitations on an independent action to set aside the judgment or to review the arbitration award, the arbitration judgment awarding O'Meara $837,000 must be set aside because it was procured by fraud." The court reached this result under the rule described in Hazel-Atlas Co. v. Hartford Co., 322 U.S. 238 (1944), overruled on other grounds by Standard Oil Co. of Cal. v. United States, 429 U.S. 17 (1976), and, alternatively, under New Hampshire common law.

5

Hazel-Atlas addressed the power of a federal court to set aside a judgment obtained by fraud despite the untimeliness of the action brought for that purpose. Hazel-Atlas, 322 U.S. at 239, 244. The time limit at issue was the term of court. Id. at 244. As the Supreme Court explained, "[f]ederal courts, both trial and appellate, long ago established the general rule that they would not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered." Id. at 244. The general rule was not, however, without exception:

> From the beginning there has existed alongside the term rule a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry. This equity rule, which was firmly established in English practice long before the foundation of our Republic, the courts have developed and fashioned to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule . . . . [I]n cases where courts have exercised the power, the relief granted has taken several forms: setting aside the judgment to permit a new trial, altering the terms of the judgment, or restraining the beneficiaries of the judgment from taking any benefit whatever from it. But whatever form the relief has taken in particular cases, the net result in every case has been the same: where the situation has required, the court has, in some manner, devitalized the judgment even though the term at which it was entered had long since passed away.

Id. at 244-45 (citations and footnote omitted).

New Hampshire common law has similarly recognized that "[f]raud will vitiate a judgment, and a court of equity may declare it a nullity." Wingate v. Haywood, 40 N.H. 437, 441 (1860). We have also observed that such relief may be granted notwithstanding a long passage of time since the challenged judgment was rendered: "The great question is, whether, after this lapse of time, this decree can be set aside or vacated for fraud and imposition; and on that point we are clear that it may be if the proofs are clear." Adams v. Adams, 51 N.H. 388, 400 (1872) (setting aside, in 1872, a divorce decree granted in 1864).

It has been noted that the "fraud exception for untimely requests" recognized in Hazel-Atlas "never included garden-variety fraud" claims such as suspected perjury by a witness. Geo. P. Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 47-48 (1st Cir. 1995). The Hazel-Atlas Court stated that the case before it was "not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to

6

have been guilty of perjury." Hazel-Atlas, 322 U.S. at 245. Rather, it involved "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." Id. at 245-46.

This type of fraud is typically called "fraud on the court" and, in federal courts, may be brought as an independent action permitted under the savings clause in Federal Rule of Civil Procedure 60(d)(3). Fed. R. Civ. P. 60(d)(3). It has been described as "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1325 (2d Cir. 1995) (emphasis added) (quotation omitted). Thus, consistent with the First Circuit's observation that fraud on the court does not encompass "garden-variety fraud," Geo. P. Reintjes, 71 F.3d at 48, "[p]erjury constitutes fraud on the court only in special situations, such as when an officer of the court commits the perjury." Myser v. Tangen, No. C14-0608JLR, 2015 WL 502316, at *6 (W.D. Wash. Feb. 5, 2015).

The treatment of perjured testimony in our cases is less clear. Perjury by a witness may constitute grounds for a new trial under the statute providing that a new trial may be granted when, due to accident, mistake or misfortune, justice has not been done. See Rasquin v. Cohen, 92 N.H. 440, 441 (1943); see RSA 526:1 (2007) (current version of statute cited in Rasquin). A petition under that statute, however, must be brought within three years of the tainted judgment. See RSA 526:4 (2007).

We have not explicitly addressed whether, or under what circumstances, a judgment may be set aside or a new trial granted, on grounds of perjury, long after the original judgment was rendered. In cases where perjury has been used to vitiate a judgment, the action, however it was brought, would seem to have been, under any measure, timely. See Craft v. Thompson, 51 N.H. 536 (1872) (arbitrators' 1870 award set aside in equity in 1872 when defendant's pleadings effectively admitted the award was obtained through his perjury); G.F.M.C. v. Mathes, 5 N.H. 574 (1832) (perjury of witness given as alternate grounds for new trial in 1832 when tainted trial held in 1830); cf. Hadges, 48 F.3d at 1325 (noting, under federal law, that "the type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope that that which is sufficient for relief by timely motion" (quotation omitted)). On the other hand, in cases where we have set aside a judgment long after it was rendered, the fraud was of a kind other than perjury. See Adams, 51 N.H. at 400 (1864 divorce decree set aside in 1872 for fraudulent failure to notify libellee of the divorce action); cf. Bussey v. Bussey, 95 N.H. 349, 350 (1949) (affirming dismissal of petition brought in 1946 to vacate 1927 divorce decree as within trial court's discretion and noting that although trial court unquestionably had the power to vacate the decree, "[a]fter a long lapse

of time and change in status of persons upon faith in the validity of the decree, this power will always be exercised with great caution" (quotation omitted)).

We need not now decide all conditions under which a judgment or award may be set aside on an untimely request, whether by motion or independent action. We hold only that fraud on the court, as recognized in Hazel-Atlas and found by the trial court in this case — in particular, perjury by an officer of the court — constitutes sufficient grounds under New Hampshire law to set aside a judgment or award.

O'Meara argues that the Hazel-Atlas doctrine does not apply on five separate grounds: (1) his "belief about events was not 'after-discovered,' but was known and discernible during his arbitration testimony"; (2) no record evidence suggests that his "rendition was 'deliberately planned' or 'carefully executed'"; (3) "the record is clear that the judgment was not 'obtained with the aid' of [his] testimony"; (4) he was "at most" a witness; and (5) his testimony "was not believed and therefore did not attack the integrity of the judicial system itself." O'Meara's arguments attempt to exploit every factual difference between this case and Hazel-Atlas. Not all, however, are relevant here. For instance, the fraud on the court doctrine we recognized above, based on our case law and the guidance of Hazel-Atlas, does not require deliberate planning or careful execution. Accordingly, we find O'Meara's second argument unpersuasive.

Similarly, O'Meara's first argument contends that his "arbitration testimony was intrinsic evidence, known at the time and not after-discovered, and subject to lengthy cross-examination." Under our case law, however, the "after-discovered" factor, if required at all, does not mean that the party seeking to set aside the judgment cannot have suspected fraud during the prior proceeding. In Craft, the plaintiff alleged that the defendant testified falsely at an arbitration hearing and that the plaintiff "was then and there unable to furnish definite and positive evidence to contradict the statement of the [defendant], though he did then and there deny the correctness thereof." Craft, 51 N.H. at 538 (preface to opinion). Thus, the perjured testimony may actually be disputed before the original tribunal. However, we have required strong proof of falsity, such as conviction of perjury on the defendant's confession, Mathes, 5 N.H. at 577, or later admission of false swearing, Craft, 51 N.H. at 544, to support relief from a judgment. Cf. Rasquin, 92 N.H. at 442 (noting that "[t]he facts of the present case are strongly suggestive of an attempt to perpetrate a fraud upon the court"); Hazel-Atlas, 322 U.S. at 245 (noting the case before it did not involve "a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury" (emphasis added)). In addition, we agree with the Idaho Supreme Court that "an independent action to set aside a judgment is a most unusual remedy, available only rarely." Waller v. State, 192 P.3d 1058, 1064 (Idaho 2008) (quotation omitted). Here, strong proof of falsity is established by our conclusion, in O'Meara's Case, that

"O'Meara lied under oath when he testified at the arbitration that the Conants agreed to his $2 million fee at the February 25 meeting." O'Meara's Case, 164 N.H. at 181. That conclusion is equivalent, for these purposes, to a conviction of perjury. Cf. Craft, 51 N.H. at 544 (finding that "[t]he defendant's practical admission of the truth of the charge of false swearing, distinctly and particularly set forth in the bill, is equivalent to his conviction of perjury in the cause, upon the hearing before the referees"). It appears from our cases that proof of falsity here sufficiently qualifies as after-discovered. Accordingly, we reject O'Meara's first argument.

O'Meara's third and fifth arguments both rest upon the premise that his testimony was not believed by the arbitrators. The trial court found, however, that "[t]he arbitrators clearly relied on O'Meara's testimony to [a certain] extent, and in this way, O'Meara's perjury was material to their judgment." The trial court made its finding as a matter of law on the basis that it was interpreting the arbitrators' decision. Cf. Appeal of Langenfeld, 160 N.H. 85, 89 (2010) (noting that "[t]he interpretation of a court order is a question of law"). Accordingly, we make our own determination on this issue de novo. Cf. O'Hearne v. McClammer, 163 N.H. 430, 436 (2012) (noting that we review trial court's legal rulings de novo).

During the arbitration hearing, O'Meara testified that the Conants agreed to his $2 million fee at the February 25 meeting. O'Meara's Case, 164 N.H. at 176. Although the falsity of this statement was not established until after the arbitration, it appears that the arbitration was influenced by this statement. The majority of the arbitration panel concluded, based upon evidence of events during the period from February 25 to February 27, that "O'Meara believed that the parties had agreed on a $2.0 million dollar fee on a recovery of the policy limit." They also found:

> The general acquiescence on February 25th of James and Anita Conant to the concept that a $2 million dollar fee on an $11 million dollar recovery was fair, followed by James Conant's actual agreement in writing to a fee in that amount, while not conclusive in establishing that the $2 million dollar fee was not excessive, is compelling evidence of the belief of the parties.

Finally, they found that "[b]oth parties . . . agreed that a $2.0 million, or 13.8% fee on . . . a [$14.5 million] recovery would be fair," and calculated the award by applying that percentage to the actual settlement amount. Given these findings, we cannot agree with O'Meara that the arbitrators' award "was not 'obtained with the aid' of [his] testimony."

Although it is not clear how much, if any, reliance on the perjured testimony by the tribunal is required under Hazel-Atlas or our cases, we conclude that the reliance evident here is sufficient. See Hazel-Atlas, 322 U.S.

9

at 247 (noting that while "it is wholly impossible accurately to appraise the influence that the [false evidence] exerted on the judges[,] . . . we do not think the circumstances call for such an attempted appraisal"). Compare Craft, 51 N.H. at 544 (noting bill in equity alleged that defendant "knowingly and willfully deceived and defrauded the arbitrators, and misled them into making such an award as they would not have made if the defendant had not been guilty of misbehavior, corruption, fraud, and perjury") with Rasquin, 92 N.H. at 442 (modifying rule so that "[w]hen a party is given a verdict and it later appears that he testified falsely on a material issue, and the evidence proves, or strongly tends to prove, that the false testimony is dishonest, the verdict will be set aside even if it is not found that a new trial will probably produce a different result").

O'Meara nevertheless asserts that the dissenting arbitrator found his testimony unpersuasive and "emphasized that the majority did not believe it either." O'Meara misstates the record. The dissenting arbitrator said that the majority made no finding that the parties agreed to a $2 million fee and that he (the dissenting arbitrator) found O'Meara's testimony that the parties had so agreed "not persuasive." Nor did we, contrary to O'Meara's assertion, note in O'Meara's Case that "'the arbitration panel likely concluded that O'Meara testified falsely.'" (Quoting O'Meara's Case, 164 N.H. at 179.) Rather, the Professional Conduct Committee "speculated" to that effect and we expressed no opinion on the issue, as "we lack[ed] a sufficient record to decide" it. O'Meara's Case, 164 N.H. at 179 (emphasis added).

O'Meara's fourth argument challenges the trial court's finding that "when O'Meara lied to the arbitrators, he did so in his capacity as an officer of the court." He contends that although he was a lawyer, he "was not acting in a representative capacity" and "was not acting as an officer of the court when he testified as a fact witness." We implicitly found to the contrary, however, when we found O'Meara's arbitration testimony to be grounds for disbarment notwithstanding that he "no longer represented the Conants when he lied to the arbitration panel." Id. at 181. We noted that "[a]s officers of the court, attorneys are prohibited from making false statements of material fact to a tribunal." Id. (quotation omitted). Accordingly, we reject O'Meara's contention that he was not an officer of the court when he testified before the arbitrators.

O'Meara nevertheless contends that the doctrine embodied in Craft in 1872 has been "superseded by New Hampshire's arbitration statute." See RSA 542:8. We disagree. As noted by the Supreme Court of Montana, "[t]he power of the court to set aside a judgment on the basis of fraud upon the court is inherent and independent of statute." Salway v. Arkava, 695 P.2d 1302, 1306 (Mont. 1985); see also Hazel-Atlas, 322 U.S. at 248 (noting that "[e]quitable relief against fraudulent judgments is not of statutory creation"). Moreover, as the Supreme Court stated in Hazel-Atlas: "Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of

litigants." Hazel-Atlas, 322 U.S. at 246. Thus, we also reject O'Meara's argument that equitable relief is unwarranted where the Conants had adequate remedies at law. A litigant's lack of diligence in pursuing legal remedies does not limit the court's inherent power to protect itself from fraud.

We conclude that because O'Meara committed perjury before the arbitrators, as an officer of the court, the trial court permissibly vacated the arbitrator's award under the fraud-on-the-court doctrine. We also conclude that the court sustainably exercised its discretion in ordering O'Meara to disgorge the $837,000 awarded by the arbitrators. In perjuring himself before the arbitration panel in an attempt to secure his own fee, O'Meara placed his own interests above those owed to his clients. We held, in In re Estate of McCool, 131 N.H. 340 (1988), that "an attorney who violates our rules of professional conduct by engaging in clear conflicts of interest, of whose existence he either knew or should have known, may receive neither executor's nor legal fees for services he renders an estate." McCool, 131 N.H. at 351. Neither are we persuaded by O'Meara's policy arguments against forfeiture and we cannot say that the trial court's order to disgorge the entire $837,000 award, as opposed to some lesser amount, constitutes an unsustainable exercise of discretion.

However, the fraud on the tribunal doctrine does not apply to the Conants' claim for forfeiture of the $750,000 they paid O'Meara prior to arbitration. The Conants contend that the trial court properly applied equitable principles under Hazel-Atlas and New Hampshire common law to avoid the statute of limitations on not only their claim to vacate the arbitrators' award but also to disgorge fees. To the extent the trial court did so, it erred. As the trial court found, the arbitrators "were only tasked with considering whether O'Meara was entitled to a disputed portion of fees." We fail to see how fraud on a tribunal can justify avoiding the time-bar of a claim not before that tribunal.

We therefore address separately whether that claim is barred by the statute of limitations. "Statutes of limitation place a limit on the time in which a plaintiff may bring suit after a cause of action accrues." Beane v. Dana S. Beane & Co., 160 N.H. 708, 712 (2010) (quotation and ellipses omitted). "Although a cause of action arises as soon as all of the necessary elements are present, it does not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, both the fact of an injury and the cause thereof." Id. (quotation and citation omitted).

We apply the general three-year limitations period for personal actions notwithstanding that the Conants brought their petition in equity. See RSA 508:4; Wentworth v. Wentworth, 75 N.H. 547, 550 (1910) (noting that "[a]s a general rule, courts of equity, equally with courts of law, are bound by the statute of limitations").

11

In the 2007 arbitrators' decision, the dissenting arbitrator noted that "[a] significant focus of the Conant[s'] presentation sought to establish that Mr. O'Meara's conduct during the period of representation violated fiduciary duties owed to his clients." The dissent also noted that the Conants argued that these breaches of fiduciary duty supported the return of all fees already paid to O'Meara. Thus, by the time of arbitration, the Conants were aware of their claim for forfeiture or disgorgement of fees. In any event, they should have reasonably become aware of that claim no later than when the arbitration decision was rendered. The dissenting arbitrator devoted fourteen pages of his opinion to explaining why O'Meara's fiduciary breaches "justif[ied] forfeiture of most, if not all, of the fees in dispute."

The Conants argue that "Terzis [v. Estate of Whalen, 126 N.H. 88 (1985),] is dispositive of [O'Meara's] timeliness . . . arguments because the Court ruled in that case that 'the policies demanding close scrutiny of attorney-client contracts [are] strong enough . . . to defeat the plaintiff's contention that the defendants failed to raise the issue of fairness in a timely fashion.'" (Quoting Terzis, 126 N.H. at 94.) We disagree. In Terzis, a lawyer brought an equitable action against the estate of his former client to foreclose a mortgage given to secure payment of the lawyer's fee. Id. at 89. We invoked "the policies demanding close scrutiny of attorney-client contracts" as a basis for allowing the estate to challenge the fairness of the fee arrangement despite not having raised that issue before the trial court. Id. at 94. Terzis does not support the proposition that an action to disgorge fees from an attorney for breaches of fiduciary duty is not subject to the statute of limitations. The Conants have claimed no other exemption from the time bar. Accordingly, we reverse the trial court's award of the $750,000 paid prior to arbitration. Having reached this conclusion, we need not address the parties' remaining arguments.

Affirmed in part; and
reversed in part.

DALIANIS, C.J., and CONBOY and LYNN, JJ., concurred.